**F I L E D**
CLERK, U.S. DISTRICT COURT

4/30/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ asi _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>RALPH OLARTE,<br>HUMBERTO LOPEZ BELMONTE,<br>SPORT LA, INC.,<br>     dba "H&R Logistics,"<br>     dba "HR Logistics,"<br>     dba "HRL,"<br>     dba "HRGL,"<br>H&R LOGISTICS, INC.,<br>     dba "HR Logistics," and<br>OLARTE TRANSPORT SERVICE, INC.<br>     dba "Sport LA, Inc.,"<br><br>          Defendants. | CR 2:25-cr-00332-MWC<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy to Smuggle Goods from the United States; 18 U.S.C. § 554: Smuggling Goods from the United States; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering; 18 U.S.C. § 1956(a)(2)(A): International Promotional and Concealment Money Laundering; 18 U.S.C. § 1001(a)(3): False Statement to a Government Agency; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. §§ 981(a)(1)(C), 982, and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

<u>COUNT ONE</u>

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A.    <u>INTRODUCTORY ALLEGATIONS</u>

At times relevant to this Indictment:

1.    Using fraudulent documents, shell companies, bribes to public officials, and kickbacks to Mexican cartels, defendants RALPH OLARTE ("OLARTE") and HUMBERTO LOPEZ BELMONTE ("LOPEZ") ran a billion-dollar shipping enterprise smuggling goods through the United States and into Mexico.

2.    From at least 2013 to the present, defendants OLARTE and LOPEZ operated a lucrative international shipping enterprise. Through shipping companies they controlled, referred to herein as the "HRL defendants," defendants OLARTE and LOPEZ smuggled billions of dollars' worth of goods from and through the United States into Mexico.  Many times, they concealed the nature of the shipped goods, some of which contained contraband.  They hid the true identities of the customers receiving the goods, in violation of United States law. They also defrauded Mexico of millions in duties owed.

3.    To move the goods into and out of the United States, defendants repeatedly misled, deceived, and lied to United States Customs and Border Protection ("CBP"), which prohibited CBP from ensuring the nature and safety of goods passing through United States ports and borders.

4.    After receiving payment from their true customers in Mexico, defendants smuggled large quantities of cash into the United States, intentionally and unlawfully avoiding cash reporting

requirements.  To maintain the façade of a legitimate business, defendants then laundered those funds through Mexican shell companies, back to the HRL defendants.

5.    To facilitate their smuggling scheme, defendants OLARTE and LOPEZ, individually and with and through the HRL defendants, bribed Mexican customs officials and paid kickbacks to Mexican drug cartels.

<u>Individuals and Entities</u>

6.    Defendant OLARTE was a United States citizen and resident of Los Angeles, California.

7.    Defendant LOPEZ was a Mexican citizen and resident of Los Angeles and Mexico City, Mexico.

8.    Defendant SPORT LA, INC. ("SLA"), which did business as "H&R Logistics," "HR Logistics," "HRL," and "HRGL," was incorporated in or around 2012 in California by defendant LOPEZ.  Defendant LOPEZ was listed as the Chief Executive Officer and Secretary of SLA. Defendant OLARTE was listed as the Chief Financial Officer.  SLA was a bonded freight carrier, authorized by CBP to receive and transport in-bond goods between ports of entry, and had a bonded carrier ID ending in 01900.  SLA operated out of offices on East Pico Boulevard in Los Angeles (the "East Pico office") and in Vernon, California (the "Vernon office").

9.    Defendant H&R LOGISTICS, INC. ("H&R"), which did business as "HR Logistics," was incorporated on or about September 26, 2023, in Florida.  Defendant LOPEZ was listed as the President, defendant OLARTE as the Vice President, and defendant OLARTE's son as the Director.  Before its incorporation, defendant H&R did business as SLA and used the business names "HR Logistics," "HR Logistics," "HRL," and "HRGL."  H&R was a freight forwarder, that is, one who

engages in the business of dispatching shipments on behalf of other persons, handles the formalities incident to such shipments, and is authorized to operate as such by an agency of the United States. Defendant H&R used defendant SLA's bond (and carrier ID number 01900) when shipping bonded goods to Mexico.

10.  Defendant OLARTE TRANSPORT SERVICE, INC. ("OLARTE TRANSPORT"), which did business as "Sport LA, Inc.," was originally incorporated in or around 2009 in California by defendant OLARTE. Defendant OLARTE was listed as the General Manager and his spouse as the Chief Executive Officer.  Defendant OLARTE TRANSPORT was a freight forwarder.  Defendant OLARTE TRANSPORT used defendant SLA's bond (and carrier ID number 01900) when shipping bonded goods to Mexico.

11.  Defendants SLA, H&R, and OLARTE TRANSPORT all used the same office locations, namely, the East Pico office and the Vernon Office. All corporate defendants are collectively referred to herein as the "HRL defendants."  Defendant H&R is included as an "HRL defendant" following its incorporation date.

12.  The Vernon office was also the location of the HRL defendants' California warehouse and served as the HRL defendants' functional headquarters by 2019.

13.  Defendants SLA and H&R used the same warehouse in El Paso, Texas (the "El Paso warehouse").

14.  Defendants OLARTE and LOPEZ beneficially owned, operated, and controlled defendants SLA and H&R.

15.  Defendant OLARTE beneficially owned, operated, and controlled defendant OLARTE TRANSPORT.

4

16.   Defendants OLARTE and LOPEZ used the HRL defendants interchangeably when shipping goods to Mexico.

17.   Defendants OLARTE and LOPEZ beneficially owned and controlled the following Mexican entities, among others, that were shell consignees for goods the HRL defendants smuggled from the United States to Mexico (collectively, "the shell consignees"):

   a.   Comercializadora Suji de Mexico SA de CV ("Suji");

   b.   Comercializadora Los Angeles Sports Mexico SA de CV ("CLA");

   c.   Grupo Comercial Bager ("Bager");

   d.   Arbol y Almendra, SA de CV ("Arbol");

   e.   Kirool Soluciones SA de CV ("Kirool");

   f.   Hutzen Mexico SA de CV ("Hutzen");

   g.   Comercializadora Infinity International SA de CV ("Infinity");

   h.   Comercializadora La Pastorela SA de CV ("Pastorela");

   i.   Grupo Industrial Y Comercial Sparky S De RL De CV ("Industrial");

   j.   Comercializadora Teknori SA de CV ("Teknori");

   k.   Consorcio Arameo SA de CV ("Arameo");

   l.   Alkanesa SA de CV ("Alkanesa"); and

   m.   HRL International ("HRLI").

18.   The shell consignees were almost exclusively non-operational shell companies used to mask the identities of the HRL defendants' true clients in Mexico.  Multiple shell consignees were nominally located at front addresses in Mexico, to make the companies appear as though they performed legitimate business, but did not possess the required licenses to import goods into Mexico.

19.   Unindicted Coconspirator 1 worked in the Vernon office as the HRL defendants' bulk cash handler.

20.   Unindicted Coconspirator 2, a former Mexican law enforcement officer, was the HRL defendants' operations manager in Mexico.

21.   Unindicted Coconspirator 3 was the Mexican Port Director of Juarez, from in or around 2014 through 2018, and the Port Director of Mexicali, from in or around January 2019 until his termination in or around August 2019.

22.   Individual 1 worked in the Vernon office as the HRL defendants' import coordinator and customs writer.

23.   Individual 2 was the manager of the HRL defendants' El Paso warehouse.

24.   Individual 3 was a truck driver for the HRL defendants.

25.   Individual 4 was an attorney for the HRL defendants.

26.   The Jalisco New Generation Cartel ("CJNG") is a drug trafficking organization that initially operated out of Jalisco but has since expanded its reach across Mexico.  It is involved in major drug trafficking corridors in states like Guerrero, Michoacán, Colima, and Veracruz.  The cartel has a strong presence in Mexico City and other major urban areas, as well as in several border towns, where it controls smuggling routes into the United States.

Customs Enforcement in the United States

27.   CBP was a federal agency of the United States, within the United States Department of Homeland Security, that was responsible for enforcing United States customs laws.

28.    In any given year relevant to this Indictment, hundreds of billions of dollars' worth of goods passed through the Ports of Los Angeles and Long Beach.

29.    All goods imported into the United States were required to be manifested upon arrival and then entered.  Duties are assessed and collected on goods entered for consumption.

30.    CBP used the Automated Commercial Environment ("ACE") system to track the importation and exportation of goods entering and leaving the United States.  The server for this data is housed in Arlington, Virginia.

31.    With some limited exclusions, not applicable in this case, all goods valued over $2,500 exported from the United States were required to be reported upon leaving the country.

32.    "Domestic goods" were goods manufactured in, or that otherwise entered into, the United States stream of commerce.

33.    An exporting company was required to declare all goods valued at more than $2,500 via the Automated Export System ("AES"), a component of ACE.  The filer of the declaration was required to include the United States Principal Party in Interest ("USPPI"), also referred to as the United States Principal Exporter, the USPPI identification number, the date of export, the ultimate consignee, the commodity description and classification number, the value of the goods, the selling price of the goods, the shipping weight, and the "related party indicator," among other mandatory fields.

34.    An exporting company was required to disclose "related party indicator" anytime a transaction involved trade between a USPPI and an ultimate consignee where either party owned directly or indirectly 10 percent or more of the other party.

35.  All parties to the export transactions, including the USPPI and export carrier, were required to retain records pertaining to the export shipment for five years from the date of export.

Special Customs Rules for In-Bond Goods

36.  "In-bond" goods were goods that were imported into the United States for transportation without appraisement.  These goods could be entered for immediate transportation without appraisement to another port, where consumption or other entries or admissions were filed or could be entered for transportation and exportation through the United States for exportation to a foreign destination from a port of exportation.  These goods were not subject to duties if the terms and conditions of the in-bond transportation were met.

37.  Entities that were permitted to transport in-bond goods through the United States to foreign countries, such as defendant SLA, were known as "bonded carriers."  A customs bond was a contract held among the principal (e.g., importer of a product or a carrier engaged to transport the product under bond to another destination with the United States) and surety company, as obligors jointly and severally liable under the terms and conditions of the bond, and CBP, as the beneficiary.  Customs bonds contractually guaranteed that the principal and surety would meet all obligations vesting under the customs laws and regulations governing the entry of merchandise, which included payment of all duties, taxes, fees, and charges in the time period and manner required.

38.  An importing company choosing to move the arriving cargo under bond was required to engage a bonded carrier to file an application to transport in-bond shipments by (1) creating a CBP Form

7512 ("Form 7512") and/or (2) transmitting an electronic in-bond application in ACE.

39.   The Form 7512 and ACE entry disclosed to CBP, among other things, the type of in-bond entry filed (e.g., a transportation and exportation entry ("T&E"), the importer, foreign consignee, the value and type of goods, the method of transport, the intended exit port, and a declaration that the information was accurate.

40.   The ultimate consignee was the foreign customer who would (1) receive the goods once they were exported from the United States and (2) ultimately owe duties to the foreign country.

41.   Within 48 hours of export, the United States company was required to update the ACE system confirming that the goods had left the United States.

42.   United States bonded freight carriers worked with customs brokers or were licensed to act as their own filers and brokers.  In either case, the carrier was required to maintain documentary proof that each in-bond shipment was exported from the United States.

Mexican Customs and Duties

43.   In Mexico, duties were imposed and collected by a federal agency called Servicio de Administración Tributaria ("SAT").

44.   The ultimate customer importing the goods into Mexico, the consignee, was required to retain a licensed Mexican customs broker to prepare and file import documentation with SAT and pay duties, which the broker collected from the consignee.  The consignee was required to pay those duties before the goods entered Mexico.

45.   A consignee would usually provide the Mexican broker with the purchase invoice for the goods to be imported.  The broker then would use the invoice to request from SAT a quote for duties to be

assessed based on the invoice.  With this documentation, the broker then would prepare and issue the customer a draft "pedimento," which would display the consignee, shipping entity, name and license number of the customs broker, description of goods to be imported, value of the goods, and duties owed to SAT.

46.  The consignee would pay the duties to the broker, who then would remit the duties to SAT along with the draft pedimento.  Once SAT received the duties and draft pedimento, it would issue a final pedimento with a unique serial number and QR code that served as electronic certification by SAT that the consignee had paid the duties for the listed goods.  The broker then would give the final certified pedimento to the consignee, which transmitted the pedimento to the shipping company in the United States for preservation as the relevant foreign landing certificate.  Beginning on or about January 1, 2022, if the goods were also traveling within the country of Mexico, the shipment had to be accompanied by a "carta porte" demonstrating the goods had been registered with SAT.  The "carta porte" would be presented in the event local law enforcement or other authorities stopped the shipment.  According to Mexico SAT, beginning on or about January 1, 2024, Mexican law enforcement began enforcing the possession of a carta porte and fining shipments that failed to obtain the required documents.

47.  When a United States freight company reached the Mexican land border with the goods, the truck driver carrying the shipment was required to present the Mexican customs officer with the final, serialized pedimento.  At most Mexican land borders, there were two separate customs stops: the initial stop where documents are examined and a second stop to confirm the vehicle is allowed into the country.

The Mexican customs officer would scan the QR code to verify (1) the authenticity of the pedimento and (2) that duties had been paid.  If the consignee had not paid the duties, or if the information on the pedimento was inaccurate or inconsistent with other shipping documentation, SAT could impose fines and seize the cargo.

48.  At the ports used by the HRL defendants, Mexican officials were required to stop every truck entering Mexico to scan the pedimento and verify payment of duties before the goods could enter the country.

49.  For goods imported to Mexico, the final landing certificate was the pedimento certified by SAT.

50.  Companies in Mexico were required to be licensed and registered with SAT to import goods into the country.

51.  In 2022, the Mexican government removed the civilian customs officers, known as Agencia Nacional de Aduanas de Mexico ("Aduana"), and delegated inspection of imports and verification of the pedimentos to the Mexican National Guard at land borders and Navy at seaports.

Defendant SLA Bank Accounts

52.  Wells Fargo Bank, National Association ("Wells Fargo"), U.S. Bank National Association ("US Bank"), BMO Financial Group, and Bank of the West were all financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation.  BMO Financial Group acquired Bank of the West in or about February 2023, retiring the Bank of the West Bank name and converting accounts to BMO Bank, N.A.

53.  Between 2016 and 2019, defendants OLARTE and LOPEZ opened bank accounts in the United States at Wells Fargo, US Bank, and Bank

of the West in the name of defendant SLA doing business as "H&R

Logistics," "HRL," and "HRGL," (collectively, the "SLA accounts"),

including the following:

   a.   A US Bank account ending in 3095 ("US Bank 3095

(SLA)"); and

   b.   A Wells Fargo account ending in 5012 ("Wells Fargo

5012 (SLA)").

   54.   Defendants OLARTE and LOPEZ had signatory authority over

each of the SLA accounts.

Shell Consignee Bank Accounts

   55.   Beginning no later than 2017, defendants OLARTE and LOPEZ

opened, or caused to be opened, bank accounts in Mexico in the names

of the shell consignees they beneficially owned and controlled

(collectively, "the shell consignee accounts"), including the

following:

| Shell Consignee | Bank | Acct. | Abbreviation |
| --- | --- | --- | --- |
| Suji | Banco Nacional de Mexico | 4051 | Banco Nacional 4051 (Suji) |
| Suji | BBVA Bancomer SA | 6908 | BBVA 6908 (Suji) |
| Suji | Banco Inbursa SA | 5845 | Banco Inbursa 5845 (Suji) |
| Suji | Scotiabank | 9428 | Scotia Bank 9428 (Suji) |
| Arameo | Banco Inbursa | 7242 | Banco Inbursa 7242 (Arameo) |
| Arameo | Banco Inbursa | 7567 | Banco Inbursa 7567 (Arameo) |
| CLA | Cibanco | 4748 | Cibanco 4748 (CLA) |
| CLA | Banco Mercantil | 7400 | Banco Mercantil 7400 (CLA) |
| Infinity | Banco Nacional de Mexico | 1839 | Banco Nacional 1839 (Infinity) |
| Infinity | Banco Inbursa SA | 2484 | Banco Inbursa 2484 (Infinity) |

| Infinity | BBVA Bancomer SA | 2383 | BBVA 2383 (Infinity) |
| Pastorela | Cibanco | 0020 | Cibanco 0020 (Pastorela) |
| Pastorela | Banco Inbursa SA | 3005 | Banco Inbursa 3005 (Pastorela) |
| Industrial | BBVA Bancomer SA | 8600 | BBVA 8600 (Industrial) |
| HRLI | BBVA Bancomer SA | 5141 | BBVA 5141 (HRLI) |
| Arbol | Banco Inbursa | 7567 | Banco Inbursa 7567 (Arbol) |
| Arbol | BBVA Bancomer SA | 5691 | BBVA 5691 (Arbol) |

Currency Reporting Requirements

56.   Any person engaged in a trade or business, and who in the course of such trade or business, received more than $10,000 in currency in one transaction, or two or more related transactions, was required to file a Form 8300 with the United States Department of Treasury within 15 days of receiving the currency.

57.   The Form 8300 required detailed information identifying the individual from whom the cash was received, the individual or business on whose behalf the cash was received, the business that received the cash, a description of the transaction, and the method of payment.

58.   A person transporting more than $10,000 in United States currency out of, or into, the United States was required to file a Currency and Monetary Instrument Report ("CMIR").

B.   THE OBJECTS OF THE CONSPIRACY

59.   Beginning in or around 2013 and continuing through the date of this Indictment, in Los Angeles County, California, within the Central District of California, and elsewhere, defendants OLARTE,

13

1   LOPEZ, and the HRL defendants, knowingly and willfully conspired with

2   one another, and with others known and unknown to the Grand Jury, to:

3           a.   Enter goods into the United States by means of false

4   statements, in violation of Title 18, United States Code, Section

5   542; and

6           b.   Smuggle goods from the United States, in violation of

7   Title 18, United States Code, Section 554.

8   C.   <u>MANNER AND MEANS OF THE CONSPIRACY</u>

9       60.   The objects of the conspiracy were to be carried out, in

10  substance, as follows:

11          a.   Defendants OLARTE and LOPEZ would establish, or cause

12  to be established, the shell consignees in Mexico.

13          b.   To cause CBP to permit the HRL defendants to import

14  and export goods, defendants OLARTE, LOPEZ, and the HRL defendants

15  would make false representations and cause the submission of

16  fabricated information to CBP, in violation of Title 13, United

17  States Code, Section 305, <u>inter alia</u>, federal laws, and regulations,

18  as follows:

19              i.   Defendants OLARTE and LOPEZ, as well as employees

20  at the HRL defendants, would create false import declarations through

21  the ACE and AES systems, including by listing the shell consignees

22  owned and operated by defendants as the "consignee" when in fact, as

23  defendants well knew, the shell consignees were not the true

24  customers and would not be paying the required duties to SAT.

25              ii.  Defendants OLARTE and LOPEZ, as well as employees

26  at the HRL defendants, would create false export declarations through

27  the AES, including by listing shell consignees owned and operated by

28

defendants as the "consignees" when in fact, as defendants well knew, the shell consignees were not the true consignees or customers.

   iii. Defendants OLARTE and LOPEZ, as well as employees at the HRL defendants, would create false in-bond declarations through false 7512 forms and ACE system entries, including by listing shell consignees owned and operated by defendants as the "consignee" when in fact, as defendants well knew, the shell consignee was not the true consignee or customer.

   iv. Defendants OLARTE, LOPEZ, and the HRL defendants would mis-manifest goods, that is, they would falsify the import and export documents to list different items than those actually shipped.

  c. Defendants OLARTE, LOPEZ, and the HRL defendants would import and export, and attempt to import and export, various contraband, including: (1) counterfeit goods, such as counterfeit medical devices and cell phone batteries, and (2) restricted goods, such as handguns, stun guns, ammunition magazines, ammunition, marijuana, and electronic cigarettes, without the required licenses.

  d. To circumvent Mexican customs law:

   i. Defendants OLARTE and LOPEZ would create, and cause the creation of, false SAT documents, including false pedimentos and carta portes.

   ii. Defendants LOPEZ and OLARTE would bribe, and facilitate bribes to, Mexican customs officials, including Unindicted Coconspirator 3.  The bribes would consist of cash and in-kind payments to members of the Aduana and Mexican National Guard.

   iii. Defendants LOPEZ and OLARTE, the HRL defendants by and through their employees, and others known and unknown to the Grand Jury, including Individual 2, would use WhatsApp to direct the

HRL defendants' truck drivers into specific Mexican customs lanes knowing defendants OLARTE and LOPEZ had facilitated bribery payments to the customs officials assigned to those lanes.  When the HRL defendants' truck drivers, including Individual 3, drove into the designated lanes, the corrupt Mexican customs officials would allow the HRL defendants' trucks through customs and into Mexico's interior without the payment of any duties.

           iv.  At the direction of defendants OLARTE, LOPEZ, and the HRL defendants, the HRL defendants' trucking operators, including Individual 2, would provide the false and fraudulent SAT documents to Mexican officials, claiming that duties had been paid, when as defendants well knew, no duties had been paid.

           v.  Defendants OLARTE, LOPEZ, and the HRL defendants would facilitate the payment of kickbacks to the CJNG Cartel, and other cartels, to allow the HRL defendants to operate.

           vi.  Unindicted Coconspirator 2 would handle the HRL defendants' operations in Mexico and, using his contacts with Mexican law enforcement officers, would ensure that the HRL defendants' shipments reached their final destinations.

           e.  Once the HRL defendants' trucks were smuggled past customs authorities in Mexico, the goods would be delivered to the HRL defendants' true clients, not the shell consignees whom defendants OLARTE and LOPEZ falsely reported or caused to be falsely reported to CBP as the ultimate recipients of the goods.

           f.  To conceal the true nature and origin of the payments, defendants OLARTE and LOPEZ directed the HRL defendants' true clients to pay the HRL defendants in cash or through deposits into the shell consignee bank accounts in Mexico.

1          i.   If the HRL defendants' true client elected to pay

2    by cash, defendants OLARTE, LOPEZ, and the HRL defendants dispatched

3    money couriers, often to a particular hotel in Juarez, Mexico, to

4    collect the currency and smuggle it to the HRL defendants in the

5    United States without filing Form 8300 or CMIRs.

6          ii.  If the HRL defendants' true client deposited

7    payment into a shell consignee bank account, defendants OLARTE and

8    LOPEZ would cause that money to be wired from the shell consignee

9    bank account to a bank account in the Central District of California

10   belonging to the HRL defendants, such as US Bank 3095 (SLA) or Wells

11   Fargo 5012 (SLA).  Throughout the conspiracy, defendants OLARTE and

12   LOPEZ wired, and caused to be wired, tens of millions of dollars from

13   the shell consignee accounts to the HRL defendants.

14         iii. When CBP officials attempted to verify certain

15   details about the HRL defendants' shipments from the United States to

16   Mexico, defendants OLARTE and LOPEZ made misrepresentations and

17   provided fraudulent documents to CBP, including by directing that

18   false pedimentos and other fraudulent foreign landing certificates be

19   given to CBP officers.

20         g.   Defendants OLARTE and LOPEZ would transport, and cause

21   to be transported, bulk cash without filing necessary currency

22   reports, including Form 8300 and CMIRs.  For instance:

23         i.   Defendants OLARTE and LOPEZ would accept, and

24   cause to be accepted, bulk cash payments in amounts greater than

25   $10,000 without issuing Form 8300.

26         ii.  Defendants OLARTE and LOPEZ would transport, and

27   cause to be transported, bulk cash to and from Mexico concealed in

28   the HRL defendants' trucks without filing CMIRs.

h.   Defendants OLARTE and LOPEZ would destroy, and cause to be destroyed, documents and communications related to the conspiracy.

61.  As a result of the conspiracy, defendants OLARTE, LOPEZ, and the HRL defendants smuggled billions of dollars' worth of domestic and in-bond goods from the United States to the HRL defendants' true clients in Mexico in order to evade duties owed to SAT and, as a result, received millions of U.S. dollars from the execution of the scheme.

D.   OVERT ACTS

62.  In furtherance of the conspiracy, and to accomplish its objects, defendants OLARTE, LOPEZ, and the HRL defendants, and others known and unknown to the Grand Jury, on or about the dates set forth below, committed and caused to be committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:  On August 28, 2013, defendant LOPEZ accepted delivery of $100,000 in bulk cash from a person who LOPEZ believed was a courier, but who, in fact, was a confidential informant, and failed to issue a Form 8300.

Overt Act No. 2:  On September 24, 2013, defendant LOPEZ accepted delivery of $160,000 in bulk cash from a person who LOPEZ believed was a courier, but who, in fact, was a confidential informant, and failed to issue a Form 8300.

Overt Act No. 3:  On July 14, 2014, the HRL defendants attempted to smuggle from the United States to Mexico 400 stun guns hidden within woven white plastic by falsely claiming to CBP that the shipment was clothing, shoes, and CD/MP3 players destined for defendant Sport LA in Mexico.

Overt Act No. 4:  On April 18, 2017, in a text message using coded language, defendants OLARTE and LOPEZ discussed using "in-bond" marketing language to alert customers that the HRL defendants were doing business under the table.

Overt Act No. 5:  On October 12, 2017, the HRL defendants attempted to ship, without the required license, 1,110 rounds of mixed caliber ammunition, 29 magazines, and four handguns, falsely claiming the shipment was in-bond children's clothing and destined for "Sport LA."

Overt Act No. 6:  On June 26, 2018, at the direction of defendant OLARTE, Individual 2 emailed CBP a falsified pedimento bearing a serial number ending in 1556.

Overt Act No. 7:  On June 26, 2018, at the direction of defendant OLARTE, Individual 2 emailed CBP a falsified pedimento bearing a serial number ending in 1558.

Overt Act No. 8:  On July 30, 2018, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "fabric" to "ultimate consignee" "GRUPO COM.BAGER S.DE.R.L.DE CV" when, in fact, the true consignee or customer was Unindicted Customer 1; defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Bager.

Overt Act No. 9:  On August 16, 2018, in a text message, defendant OLARTE sent defendant LOPEZ a list of the HRL defendants' true clients.

Overt Act No. 10: On August 21, 2018, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false

information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "fabric" to "ultimate consignee" "GRUPO COM.BAGER S.DE.R.L.DE CV" when, in fact, the true consignee or customer was Unindicted Customer 2; and defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Bager.

Overt Act No. 11: On August 21, 2018, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that Sport LA had imported an in-bond shipment of "ladies vests" via "H&R Logistics" for "consignee" "Arbol Y Almendra, SA" when, in fact, the true consignee or customer was Unindicted Customer 3.

Overt Act No. 12: On September 10, 2018, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "clothing" to "ultimate consignee" "GRUPO COM.BAGER S.DE.R.L.DE CV" when, in fact, the true consignee or customer was Unindicted Customer 4; and defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Bager.

Overt Act No. 13: On September 20, 2018, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that Hutzen Mexico SA had imported an in-bond shipment of "fabrics" via "H&R Logistics" for "consignee" "Hutzen Mexico SA" when, in fact, the true consignee or customer was Unindicted Customer 5.

Overt Act No. 14: On October 4, 2018, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT

documents for presentation to Mexican customs officials to erroneously suggest that duties had been paid on each shipment.

Overt Act No. 15: On October 4, 2018, defendants OLARTE, LOPEZ, and the HRL defendants caused goods from the United States to be smuggled to "Tigre 2" in Mexico by falsely claiming to CBP that the shipment was going to shell consignee Hutzen.

Overt Act No. 16: On November 16, 2018, in text messages using coded language, defendant LOPEZ reassured a client that defendant LOPEZ could ship goods from the United States to Mexico faster than prior shipments because of defendant LOPEZ's relationship with the Aduana.

Overt Act No. 17: On November 28 and 29, 2018, in a series of text messages using coded language, defendant LOPEZ told one of the HRL defendants' client he needed to get paid, preferably in "cash," to pay the Aduana to facilitate the export of goods from the United States to Mexico.

Overt Act No. 18: On February 4, 2019, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "fabric" to "ultimate consignee" "GRUPO COM.BAGER S.DE.R.L.DE CV" when, in fact, the true consignee or customer was Unindicted Customer 6; and defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Bager.

Overt Act No. 19: On March 28, 2019, in a text message using coded language, defendant LOPEZ and a client of the HRL defendants arranged for a bulk cash transaction consistent with a prior transaction.

1    <u>Overt Act No. 20:</u> On April 5, 2019, in a text message using

2    coded language, defendant LOPEZ told an unknown person that

3    defendant LOPEZ "can't let customs down" and had to pay customs

4    "every day."

5    <u>Overt Act No. 21:</u> From May 12, 2019 through June 12, 2019,

6    defendants OLARTE, LOPEZ, and the HRL defendants smuggled

7    approximately 312 separate shipments for which Suji was falsely

8    listed as the consignee, but which were instead delivered to the

9    HRL defendants' true customers.  In connection with these

10   shipments, defendants OLARTE, LOPEZ, and the HRL defendants caused

11   the creation of false SAT documents, which were presented to

12   Mexican customs officials, claiming that duties had been paid, when

13   they had not.

14   <u>Overt Act No. 22:</u> On May 14, 2019, the HRL defendants

15   attempted to ship counterfeit Los Angeles Dodgers gear to Mexico.

16   <u>Overt Act No. 23:</u> On June 21, 2019, in a text message using

17   coded language, a client of the HRL defendants told defendant LOPEZ

18   that he had his "other 10K" and asked defendant LOPEZ to send

19   someone to Monte Tauro, in Mexico City, to pick up the cash.

20   Defendant LOPEZ confirmed in response that the cash was United

21   States currency and then said he would send a courier.

22   <u>Overt Act No. 24:</u> On July 23, 2019, in a text message using

23   coded language, defendant LOPEZ directed one of the HRL defendants'

24   true clients in Mexico to make a deposit into Banco Inbursa 5845

25   (Suji).

26   <u>Overt Act No. 25:</u> On September 10, 2019, the HRL defendants

27   attempted to ship counterfeit Gucci clothing to Mexico.

28

Overt Act No. 26: On October 8, 2019, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "bales of clothing" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 8; and defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Suji.

Overt Act No. 27: On October 10, 2019, the HRL defendants smuggled goods from the United States to Unindicted Customer 1 in Mexico by falsely claiming to CBP that the shipment was going to shell consignee Suji; in doing so, the HRL defendants intended and facilitated the avoidance of any duties or tax to SAT.

Overt Act No. 28: On October 11, 2019, in a text messages using coded language, a client of the HRL defendants told defendant LOPEZ that he would send defendant LOPEZ a surprise in Los Angeles of "20," code for $20,000, and would bring more later.

Overt Act No. 29: On November 26, 2019, in text messages using coded language, a client of the HRL defendants told defendant LOPEZ to check with his Los Angeles employees about a $20,000 cash payment the client delivered to the HRL defendants that day. The client provided a screenshot of a conversation with a courier who stated that $7,500 had been dropped off to the HRL defendants' employees. Defendant LOPEZ confirmed that the money had been dropped off.

Overt Act No. 30: On June 2, 2020, in text messages using coded language, defendant LOPEZ asked a client of the HRL defendants for verification of a deposit. The client then sent

defendant LOPEZ a confirmation reflecting that he deposited approximately $9,829 into Banco Inbursa 7567 (Arbol).

Overt Act No. 31: On July 15, 2020, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "TV" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 10; and defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Suji.

Overt Act No. 32: From July 16, 2020 to August 18, 2020, defendants OLARTE, LOPEZ, and the HRL defendants smuggled approximately 1,529 separate shipments purportedly to Suji, but actually delivered to one of the HRL defendants' true customers, intentionally facilitating the avoidance of any duty payments to SAT. In connection with these shipments, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 33: On August 18, 2020, in text messages using coded language, defendant LOPEZ directed one of the HRL defendants' clients to make a deposit into Banco Inbursa 7242, an account opened in the name of Arameo in Mexico.  The client then sent defendant LOPEZ verification that the client deposited approximately $12,978 into Banco Inbursa 7242 (Arameo).

Overt Act No. 34: From August 18, 2020 to September 18, 2020, defendants OLARTE, LOPEZ, and the HRL defendants smuggled approximately 1,370 separate shipments purportedly to Suji, but

which were actually delivered to one of the HRL defendants' true customers, intentionally facilitating the avoidance of any duty payments to SAT. In connection with these shipments, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 35: On September 29, 2020, in text messages using coded language, one of the HRL defendants' client sent defendant LOPEZ a confirmation that he had deposited approximately $17,718 into Scotiabank 9428 (Suji) that day.

Overt Act No. 36: On January 4, 2021, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "shoes" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 11; and defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Suji.

Overt Act No. 37: On January 18, 2021, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: "H&R Logistics" had imported an in-bond shipment of "rolls of fabric" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 17.

Overt Act No. 38: From December 28, 2020, through January 27, 2021, defendants OLARTE, LOPEZ, and the HRL defendants smuggled approximately 1,221 separate shipments purportedly to Suji but actually delivered the shipments to one of the HRL defendants' true

customers, intentionally avoiding tax payments to SAT.  In connection with these shipments, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 39: On February 2, 2021, in text messages using coded language, defendant LOPEZ discussed one of the HRL defendants' client's failure to pay and explained that if defendant LOPEZ did not pay Aduana, they were not going to provide their services.

Overt Act No. 40: On March 11, 2021, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: that "H&R Logistics" had imported an in-bond shipment of "ladies pants, ladies jackets" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 7.

Overt Act No. 41: On May 3, 2021, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: that "H&R Logistics" had imported an in-bond shipment of "ROL fabric" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 18.

Overt Act No. 42: On May 5, 2021, defendants OLARTE, LOPEZ, and the HRL defendants smuggled goods from the United States to Unindicted Customer 18 in Mexico by falsely claiming to CBP that the shipment was going to shell consignee Suji, intentionally

facilitating the avoidance of any duty payments to SAT.  Defendants OLARTE, LOPEZ, and the HRL defendants also caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 43: On June 18, 2021, in text messages using coded language, one of the HRL defendants' clients sent defendant LOPEZ confirmation reflecting that the same day the client had deposited $14,838 into Banco Nacional 4051 (Suji).

Overt Act No. 44: On August 17, 2021, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: that "H&R Logistics" had imported an in-bond shipment of "ladies woven pants" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 16.

Overt Act No. 45: On August 29, 2021, in text messages using coded language, defendant LOPEZ told a client that defendant LOPEZ had been slow for weeks because the Aduana had changed, meaning particular customs officials had been replaced, but defendant LOPEZ had since made the same deal with other officials.

Overt Act No. 46: On October 15, 2021, in text messages using coded language, one of the HRL defendants' clients wrote to defendant OLARTE "it's gonna be cash" and asked defendant OLARTE to provide an address so he could send his courier.  Defendant OLARTE provided the East Pico address along with a phone number for one of the HRL defendants' employees and sent a picture of the exchange rate.

Overt Act No. 47: On November 12, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3503 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 48: On November 12, 2021, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to appeal on CBP Form 7512: that "H&R Logistics" had imported an in-bond shipment of "polyester fabric" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 9.

Overt Act No. 49: On November 13, 2021, defendants OLARTE, LOPEZ, and the HRL defendants smuggled goods from the United States to Unindicted Customer 9 in Mexico by falsely claiming to CBP that the shipment was going to shell consignee Suji, intentionally facilitating the avoidance of any duty payments to SAT.  Defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 50: On December 2, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3550 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 51: On December 3, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3551 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 52: On December 3, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento

bearing a serial number ending in 3552 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 53: On December 6, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3553 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 54: On December 8, 2021, in text messages using coded language, defendant LOPEZ asked Unindicted Coconspirator 1 to send him the instructions. In response, Unindicted Coconspirator 1 sent defendant LOPEZ a screenshot of the HRL defendants' instruction sheet directing clients to list Suji as the consignee.

Overt Act No. 55: On December 9, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3556 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 56: On December 9, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3557 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 57: On December 10, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3558 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 58: On December 10, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3559 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 59: On December 17, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3561 and reflecting that the corresponding goods was destined for shell consignee Kirool.

Overt Act No. 60: On December 17, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3562 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 61: On December 17, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3563 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 62: On December 17, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3564 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 63: On December 21, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3565 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 64: On December 21, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3567 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 65: On December 30, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3568 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 66: On December 30, 2021, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 3569 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 67: On January 24, 2022, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 2004 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 68: On January 24, 2022, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 2005 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 69: On January 24, 2022, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 2006 and reflecting that the corresponding goods was destined for shell consignee Kirool.

Overt Act No. 70: On January 28, 2022, at the direction of defendant OLARTE, Individual 4 emailed CBP a false pedimento bearing a serial number ending in 2100 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 71: On February 8, 2022, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 2008 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 72: On February 8, 2022, at the direction of defendant OLARTE, Individual 1 emailed CBP a false pedimento bearing a serial number ending in 2009 and reflecting that the corresponding goods were destined for shell consignee Kirool.

Overt Act No. 73: From January 24, 2022 through February 24, 2022, defendants OLARTE, LOPEZ, and the HRL defendants smuggled approximately 2,916 separate shipments purportedly to Suji, but which were actually delivered to the HRL defendants' true customers, intentionally facilitating the avoidance of any duty payments to SAT.  In connection with this shipment, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 74: On February 24, 2022, one of the HRL defendants' clients sent defendant LOPEZ confirmation that he deposited approximately $12,365 into BBVA 5141 (HRLI).

Overt Act No. 75: On May 2, 2022, in a text message using coded language, defendant LOPEZ asked Unindicted Coconspirator 1 to send him the instructions for two of the HRL defendants' clients. Unindicted Coconspirator 1 sent defendant LOPEZ an HRL instruction sheet directing clients to list Arbol as the consignee.

Overt Act No. 76: On May 10, 2022, the HRL defendants attempted to smuggle cannabis oil electronic cigarette cartridges into Mexico.

Overt Act No. 77: On June 20, 2022, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: that "H&R Logistics" had imported an in-bond shipment of "Audio Adapter" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 19.

Overt Act No. 78: On June 21, 2022, defendants OLARTE, LOPEZ, and the HRL defendants smuggled goods from the United States to Unindicted Customer 19, in Mexico, by falsely claiming to CBP that the shipment was going to shell consignee Suji, intentionally facilitating the avoidance of any duty payments to SAT.  In connection with this shipment, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 79: On June 22, 2022, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "BEAUTY PRODUCTS/ COSMETICS" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 13; defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Suji.

Overt Act No. 80: On August 28, 2022, defendants OLARTE, LOPEZ, and the HRL defendants, knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA, was exporting "LINGERIE" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 14; defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Suji.

Overt Act No. 81: On August 29, 2022, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: that "H&R

Logistics" had imported an in-bond shipment of "ladies jeans" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 5.

Overt Act No. 82: On August 30, 2022, defendants OLARTE, LOPEZ, and the HRL defendants smuggled goods from the United States to Unindicted Customer 5 in Mexico by falsely claiming to CBP that the shipment was going to shell consignee Suji, intentionally facilitating the avoidance of any duty payments to SAT.  Defendants OLARTE, LOPEZ, and the HRL defendants also caused the creation of false SAT documents, which were presented to Mexican customs officials, clai6ming that duties had been paid, when they had not.

Overt Act No. 83: On September 9, 2022, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted onto a CBP Form 7512: that "H&R Logistics" had imported an in-bond shipment of "day goods for department stores" via "H&R Logistics" for "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 20.

Overt Act No. 84: On September 22, 2022, defendants OLARTE, LOPEZ, and the HRL defendants smuggled goods from the United States to Unindicted Customer 20 in Mexico by falsely claiming to CBP that the shipment was going to shell consignee Suji, intentionally facilitating the avoidance of any duty payments to SAT.  In connection with this shipment, defendants OLARTE, LOPEZ, and the HRL defendants caused the creation of false SAT documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 85: On September 22, 2022, defendants OLARTE, LOPEZ, and the HRL defendants attempted to ship counterfeit medical devices worth an estimated $379,000, claiming the shipment was in-bond "beauty instruments" worth $14,391, destined for Suji in Mexico; the shipment was stopped by CBP in Los Angeles.

Overt Act No. 86: On December 29, 2022, in a text message, defendant LOPEZ sent a client a screenshot of the HRL defendants' instruction sheets directing the client to list the HRL defendants' shell companies in Mexico as the consignees.

Overt Act No. 87: On January 23, 2023, in text messages using coded language, an employee of the HRL defendants instructed the HRL defendants' truck drivers via WhatsApp to use certain customs lanes at the Mexican border.

Overt Act No. 88: On January 26, 2023, in a text message using coded language, one of the HRL defendants' truck drivers said the driver was "ready with the papers," and one of the HRL defendants' employees told the driver to take customs lanes 2 and 1.

Overt Act No. 89: On or May 31, 2023, an unindicted coconspirator delivered $45,700 in United States currency to the HRL defendants.

Overt Act No. 90: From October 16, 2023 through November 14, 2022, defendants OLARTE, LOPEZ, and the HRL defendants smuggled approximately 1,541 separate shipments purportedly to Suji, but which were delivered to the HRL defendants' true customers, intentionally facilitating the avoidance of any duty payments to SAT. In connection with these shipments, defendants OLARTE, LOPEZ, and the HRL defendants also caused the creation of false SAT

documents, which were presented to Mexican customs officials, claiming that duties had been paid, when they had not.

Overt Act No. 91: On December 27, 2023, defendants OLARTE, LOPEZ, and the HRL defendants knowingly caused the following false information to be inputted into the AES system: that the US Principal Exporter Sport LA was exporting "Woman Clothing" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, the true consignee or customer was Unindicted Customer 15; defendants also knowingly misled CBP by failing to disclose that defendants owned more than 10% of Suji.

Overt Act No. 92: On March 24, 2025, defendants OLARTE, LOPEZ, and the HRL defendants attempted to smuggle 200 units of THC vape pens and 10,000, (6.8 kilograms) of marijuana "rolled joints," claiming the shipment was in-bond "clothing/garments/plastic toys" destined for Suji in Mexico; the shipment was stopped by CBP in Columbus, New Mexico.

1

COUNT TWO

2

[18 U.S.C. §§ 554(a), 2(b)]

3

[Defendants OLARTE, LOPEZ, and SLA]

4      63.  The Grand Jury realleges paragraphs 1 through 58 and 60

5 through 61 of this Indictment here.

6      64.  On or about the dates set forth below, in Los Angeles

7 County, within the Central District of California, and elsewhere,

8 defendants RALPH OLARTE, HUMBERTO LOPEZ BELMONTE, and SPORT LA, INC.,

9 which did business as "H&R Logistics," "HR Logistics," "HRL," and

10 "HRGL," and others known and unknown to the Grand Jury, aiding and

11 abetting each other, knowingly attempted to export goods contrary to

12 Title 13, United States Code, Section 305, that is, knowingly

13 submitting false and misleading export information through AES.

| Count | Date | Attempted Export |
|-------|------|------------------|
| TWO | 03/24/2025 | 200 units of THC vape pens and 10,000, (6.8 kilograms) of marijuana "rolled joints," claiming the shipment was "women's clothing" destined for Suji in Mexico. |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

COUNTS THREE THROUGH FIVE

2

[18 U.S.C. §§ 554(a), 2(b)]

3

[DEFENDANTS OLARTE, LOPEZ, and SLA]

4      65.  The Grand Jury realleges paragraphs 1 through 58 and 60

5  through 61 of this Indictment here.

6      66.  On or about the dates set forth below, in Los Angeles

7  County, within the Central District of California, and elsewhere,

8  defendants RALPH OLARTE, HUMBERTO LOPEZ BELMONTE, and SPORT LA, INC.,

9  which did business as "H&R Logistics," "HR Logistics," "HRL," and

10 "HRGL," and others known and unknown to the Grand Jury, aiding and

11 abetting each other, knowingly and willfully caused the exportation

12 of goods contrary to Title 13, United States Code, Section 305, that

13 is, knowingly submitting false and misleading export information

14 through AES.

| Count | Date | Export |
|-------|------|--------|
| THREE | 07/15/2020 | "TV" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO," from El Paso, Texas, to Mexico, when, in fact, the true consignee or customer receiving the goods was Unindicted Customer 10. |
| FOUR | 06/22/2022 | "BEAUTY PRODUCTS/ COSMETICS" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO," from El Paso, Texas, to Mexico, when, in fact, the true consignee or customer that was receiving the goods was Unindicted Customer 13. |
| FIVE | 08/28/2022 | "LINGERIE" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO," from El Paso, Texas, to Mexico when, in fact, the true consignee or customer receiving the goods was Unindicted Customer 14. |

COUNTS SIX THROUGH TEN

[18 U.S.C. §§ 1343, 2(a)]

[DEFENDANTS OLARTE, LOPEZ, and SLA]

67.  The Grand Jury hereby realleges paragraphs 1 through 58 and 60 through 61 of this Indictment here.

A.  SCHEME TO DEFRAUD

68.  Beginning in or around 2017 and continuing to at least the date of this Indictment, within the Central District of California, and elsewhere, defendants RALPH OLARTE ("OLARTE"), HUMBERTO LOPEZ BELMONTE ("LOPEZ"), and SPORT LA, INC. ("SLA"), which did business as "H&R Logistics," "HR Logistics," "HRL," and "HRGL," and others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud United States Customs and Border Protection ("CBP"), and to induce CBP to not impose United States duties and penalties and to release property held by CBP, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.  USE OF INTERSTATE WIRES

69.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendants OLARTE, LOPEZ, and SLA, and others known and unknown to the Grand Jury, transmitted and caused the transmission of the following wire communications in interstate commerce:

| Count | Date | Interstate Wiring |
|-------|------|-------------------|
| SIX | 11/12/2021 | The email submission to CBP of a false pedimento bearing serial number 21-07-3419-1003503 sent by means of interstate wire. |
| SEVEN | 12/02/2021 | The email submission to CBP of a false pedimento bearing serial number 21-07-3419-1003550 sent by means of interstate wire. |
| EIGHT | 12/03/2021 | The email submission to CBP of a false pedimento bearing serial number 21-07-3419-1003552 sent by means of interstate wire. |
| NINE | 12/03/2021 | The email submission to CBP of a false pedimento bearing serial number 21-07-3419-1003551 sent by means of interstate wire. |
| TEN | 01/28/2022 | The email submission to CBP of a false pedimento bearing serial number 21-07-3419-1002100 sent by means of interstate wire. |

1               COUNT ELEVEN

2            [18 U.S.C. § 1349]

3            [ALL DEFENDANTS]

4       70.  The Grand Jury hereby realleges paragraphs 1 through 58 of

5  this Indictment here.

6  A.   THE OBJECT OF THE CONSPIRACY

7       71.  Beginning in or around 2013 and continuing to at least the

8  date of this Indictment, in Los Angeles County, within the Central

9  District of California, and elsewhere, defendants RALPH OLARTE

10 ("OLARTE"), HUMBERTO LOPEZ BELMONTE ("LOPEZ"), SPORT LA, INC.

11 ("SLA"), which did business as "H&R Logistics," "HR Logistics,"

12 "HRL," and "HRGL," H&R LOGISTICS, INC. ("H&R"), which did business as

13 "HR Logistics," and OLARTE TRANSPORT SERVICE, INC. ("OLARTE

14 TRANSPORT," and collectively with defendants SLA and H&R, "the HRL

15 defendants"), which did business as "Sport LA, Inc.," conspired with

16 one another, and with others known and unknown to the Grand Jury, to

17 commit wire fraud, in violation Title 18, United States Code,

18 Section 1343.

19 B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

20      ACCOMPLISHED

21      72.  The object of the conspiracy was to be carried out, in

22 substance, as follows:

23           a.   Defendants OLARTE and LOPEZ would establish, or cause

24 to be established, shell consignees in Mexico.

25           b.   Defendants OLARTE and LOPEZ, as well as employees and

26 workers at the HRL defendants, would create false import declarations

27 through the ACE and AES systems, including by listing the shell

28 consignees owned and operated by defendants as the "consignee" when,

41

in fact, as defendants well knew, the shell consignees were not the true customers and would not be paying the required duties to SAT.

c.    In making these false representations and submitting this fabricated information, defendants OLARTE, LOPEZ, and the HRL defendants intended that CBP would permit the HRL defendants to import and export goods.

d.    Defendants OLARTE, LOPEZ, and the HRL defendants would create, or cause to be created, false documents hiding the nature of the goods being shipped into Mexico, which at times included contraband and counterfeit goods, to be shown to both CBP and Mexican customs officials.

e.    Defendants OLARTE, LOPEZ, and the HRL defendants would create, or cause to be created, false "pedimento" documents purporting to show that duties had been paid to SAT on the shipped goods, when, in fact, the records were false and created to facilitate entry into Mexico and avoid payment of duties owed.

f.    Defendants OLARTE, LOPEZ, and the HRL defendants would create, or cause to be created, false "carta porte" documents purporting to show the HRL defendants' shipments had been registered with SAT, when, in fact, the records were false and created in case the shipments were stopped by Mexican law enforcement.

g.    Defendants OLARTE and LOPEZ would bribe and facilitate bribes to Mexican customs officials, including Unindicted Coconspirator 3, to allow the shipment of goods without the payment of duties to SAT.  The bribes would consist of cash and in-kind payments to members of the Aduana and Mexican National Guard.

h.    At the direction of defendants LOPEZ and OLARTE, the HRL defendants' employees, workers, and others known and unknown to

the Grand Jury, including Individual 2, would use WhatsApp to direct HRL truck drivers into specific Mexican customs lanes knowing that defendants OLARTE and LOPEZ had facilitated bribery payments to the customs officials assigned to those lanes. When the HRL defendants' truck drivers, including Individual 3, would drive into the designated lanes, the corrupt Mexican customs officials would allow the truck through customs and into Mexico's interior without the payment of any duties to SAT.

      i.   At the direction of defendants OLARTE, LOPEZ, and the HRL defendants, the HRL defendants' trucking operators, including Individual 2, would provide the false and fraudulent SAT documents to Mexican officials, claiming that duties had been paid when, as defendants well knew, no duties had been paid.

      i.   Defendant OLARTE, LOPEZ, and the HRL defendants would facilitate the payment of kickbacks to the CJNG Cartel and other cartels to allow the HRL defendants to operate.

      ii.   Unindicted Coconspirator 2 would handle the HRL defendants' operations in Mexico and, using his contacts with Mexican law enforcement officers, ensured that the HRL defendants' shipments reached their final destinations.

      j.   If CBP inquired about the representations or goods being imported and exported, defendants OLARTE and LOPEZ would provide additional false and fraudulent information, including fraudulent pedimentos claiming that the HRL defendants' customers had paid import duties, when, in fact, they had not.

      k.   Once the HRL defendants' trucks were smuggled past customs authorities in Mexico, the goods would be delivered to the HRL defendants' true clients, not the shell consignees.

43

l. Defendants OLARTE and LOPEZ would direct the HRL defendants' true clients to pay the HRL defendants by cash, or by depositing money into the shell consignee bank accounts in Mexico, in order to conceal origin of the payments.

i. If the HRL defendants' true client elected to pay by cash, defendant OLARTE and LOPEZ would dispatch money couriers, often to a particular hotel in Juarez, Mexico, to collect the currency and smuggle it to the HRL defendants in the United States without filing Form 8300 or CMIRs.

ii. If the HRL defendants' true client deposited payment into a shell consignee bank account, defendants OLARTE and LOPEZ would cause that money to be wired from the shell consignee bank account to a bank account for one of the HRL defendants in the Central District of California, for example, US Bank 3095 (SLA) or Wells Fargo 5012 (SLA). Throughout the conspiracy, defendants OLARTE and LOPEZ wired, and caused to be wired, tens of millions of dollars from the shell consignee accounts to the HRL defendants.

73. As a result of the conspiracy, Mexico SAT and the Mexican government lost millions (in U.S. dollars) in revenue.

74. As a result of the conspiracy, defendants OLARTE, LOPEZ, and the HRL defendants smuggled billions of dollars' worth of domestic and in-bond goods from the United States to the HRL defendants' true clients in Mexico by making false representations to Mexican Customs Authorities, in order to evade duties owed to SAT, and as a result, defendants OLARTE and LOPEZ personally received millions of U.S. dollars from the execution of the scheme.

COUNT TWELVE

[18 U.S.C. § 1956(h)]

[ALL DEFENDANTS]

75.  The Grand Jury realleges paragraphs 1 through 58 of this Indictment here.

A.  OBJECTS OF THE CONSPIRACY

76.  Beginning no later than in or around 2013, and continuing until at least on or about the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendants RALPH OLARTE ("OLARTE"), HUMBERTO LOPEZ BELMONTE ("LOPEZ"), SPORT LA, INC. ("SLA"), which did business as "H&R Logistics," "HR Logistics," "HRL," and "HRGL," H&R LOGISTICS, INC. ("H&R"), which did business as "HR Logistics," and OLARTE TRANSPORT SERVICE, INC. ("OLARTE TRANSPORT," and collectively with defendants SLA and H&R, "the HRL defendants"), which did business as "Sport LA, Inc.," and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to commit an offense against the United States, namely:

        a.  Transport, transmit, and transfer monetary instruments and funds from a place outside the United States, that is, Mexico, to a place in the United States, intending that each of the transactions, in whole or in part, promote the carrying on of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343; and

        b.  Transport, transmit, and transfer monetary instruments and funds from an account at a financial institution outside the United States, that is, an account in Mexico, to an account at a financial institution inside the United States, knowing that the

45

monetary instruments and funds involved in the financial transaction

represented the proceeds of some form of unlawful activity, that is,

wire fraud, in violation of Title 18, United States Code, Section

1343, and knowing that the transaction was designed in whole or in

part: (i) to conceal and disguise the nature, location, source,

ownership, and the control of the proceeds of said specified unlawful

activity, and (ii) to avoid a transaction reporting requirement under

federal law, in violation of Title 18, United States Code, Sections

1956(a)(2)(B)(i), (ii).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
      ACCOMPLISHED

77.    The objects of the conspiracy were to be accomplished, in

substance, as follows:

        a.    Defendants OLARTE, LOPEZ, and the HRL defendants,

together with others known and unknown to the Grand Jury, would

smuggle goods out of the United States and into Mexico, thereby

intentionally avoiding the payment of any duties by providing false

information to CBP, concealing the identity of the true customers,

creating and presenting false SAT documents, and bribing Mexican

officials.

        b.    At the direction of defendants OLARTE, LOPEZ, and the

HRL defendants, the true customers would make payments to the HRL

defendants through shell consignee accounts in order to promote and

further the HRL defendants' smuggling activities.

        c.    At the directly of defendants OLARTE, LOPEZ, and the

HRL defendants, the true customers would not pay the HRL defendants

directly and would instead make payment through the shell consignee

accounts to conceal the source of the funds.

1          d.    Defendants OLARTE and LOPEZ would transfer, or cause

2   the transfer of, payments in shell consignee accounts into the HRL

3   defendants' bank accounts in the United States by means of foreign

4   wire communication.

5          e.    Defendants OLARTE, LOPEZ, and the HRL defendants would

6   receive cash payments in excess of $10,000 in United States currency

7   from the true customers based in Mexico as payment for the smuggling

8   of goods into Mexico and avoiding payment of import duties.

9          f.    To conceal the nature of the conspiracy, defendants

10  OLARTE, LOPEZ, and the HRL defendants would not file Form 8300

11  despite the receipt of payments requiring the filing of Form 8300.

12  Rather, defendants OLARTE, LOPEZ, and the HRL defendants would cause

13  the HRL defendants' employees and others to transport United States

14  currency from Mexico into the United States in amounts less than

15  $10,000 to avoid federal currency reporting requirements.

16  C.   OVERT ACTS

17       78.   In furtherance of the conspiracy, and to accomplish its

18  objects, defendants OLARTE, LOPEZ, and the HRL defendants, and others

19  known and unknown to the Grand Jury, on or about the dates set forth

20  below, committed and caused to be committed the following overt acts,

21  among others, in the Central District of California and elsewhere:

22       Overt Act No. 93: On August 28, 2013, defendant LOPEZ accepted

23    delivery of $100,000 in bulk cash from a person who LOPEZ believed

24    was a courier, but who, in fact, was a confidential informant, and,

25    subsequently, LOPEZ failed to issue a Form 8300.

26       Overt Act No. 94: On September 24, 2013, defendant LOPEZ

27    accepted delivery of $160,000 in bulk cash from a person who LOPEZ

28

believed was a courier, but who, in fact, was a confidential

informant, and, subsequently, LOPEZ failed to issue a Form 8300.

Overt Act No. 95: On February 12, 2018, defendants OLARTE,

LOPEZ, and the HRL defendants caused a wire in the amount of

approximately $50,000 to be transmitted from Cibanco 4748 (CLA) in

Mexico to US Bank 3095 (SLA) in the United States.

Overt Act No. 96: On June 12, 2019, defendants OLARTE, LOPEZ,

and the HRL defendants caused a wire in the amount of approximately

$15,000 to be transmitted from Banco Inbursa 5845 (Suji) in Mexico

to US Bank 3095 (SLA) in the United States.

Overt Act No. 97: On July 18, 2019, defendants OLARTE, LOPEZ,

and the HRL defendants caused a wire in the amount of approximately

$19,595 to be transmitted from Cibanco 0020 (Pastorela) in Mexico

to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 98: On July 23, 2019, defendant LOPEZ directed

one of the HRL defendants' true clients in Mexico to make a deposit

into Banco Inbursa 5845 (Suji).

Overt Act No. 99:  On July 23, 2019, defendants OLARTE, LOPEZ,

and the HRL defendants caused a wire in the amount of approximately

$11,240 to be transmitted from Banco Inbursa 2484 (Infinity) in

Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 100: On August 9, 2019, defendants OLARTE,

LOPEZ, and the HRL defendants caused a wire in the amount of

approximately $16,027 to be transmitted from Banco Inbursa 7567

(Arbol) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 101: On May 21, 2020, defendants OLARTE, LOPEZ,

and the HRL defendants caused a wire in the amount of approximately

$10,000 to be transmitted from Banco Inbursa 7567 (Arbol) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 102: On June 2, 2020, in text messages using coded language, defendant LOPEZ asked a client of the HRL defendants for verification of a deposit.  The client then sent defendant LOPEZ a confirmation reflecting that the client had deposited approximately $9,829 into Banco Inbursa 7567 (Arbol).

Overt Act No. 103: On June 6, 2020, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $29,360 to be transmitted from Cibanco 4407 (CLA) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 104: On August 18, 2020, in text messages using coded language, defendant LOPEZ directed one of the HRL defendants' client to make a deposit into Banco Inbursa 7242, an account opened in the name of Arameo in Mexico.  The client then sent defendant LOPEZ verification that he deposited approximately $12,978 into Banco Inbursa 7242 (Arameo).

Overt Act No. 105: On August 18, 2020, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $5,600 to be transmitted from Banco Inbursa 7567 (Arameo) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 106: On August 20, 2020, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $9,800 to be transmitted from Banco Inbursa 7567 (Arameo) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 107: On September 18, 2020, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of

approximately $13,973 to be transmitted from Scotiabank 9428 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 108: On September 18, 2020, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $14,973 to be transmitted from Scotiabank 9428 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 109: On September 29, 2020, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $22,670 to be transmitted from Scotiabank 9428 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 110: On January 6, 2021, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $20,000 to be transmitted from Banco Inbursa 7242 (Arameo) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 111: On January 27, 2021, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $28,988 to be transmitted from Banco Mercantil 7400 (CLA) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 112: On January 28, 2021, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $49,970 to be transmitted from Scotiabank 9428 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 113: On June 14, 2021, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $12,490 to be transmitted from BBVA 5691 (Arbol) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 114: On June 18, 2021, in text messages using coded language, a client of the HRL defendants sent defendant LOPEZ

confirmation reflecting that the client had deposited $14,838 into Banco Nacional 4051 (Suji) that day.

Overt Act No. 115: On June 18, 2021, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $6,700 to be transmitted from Banco Nacional 5041 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 116: On February 24, 2022, a client of the HRL defendants sent defendant LOPEZ confirmation that the client deposited approximately $12,365 into BBVA 5141 (HRLI) the prior day.

Overt Act No. 117: On February 24, 2022, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $19,990 to be transmitted from BBVA 5141 (HRLI) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 118: On May 4, 2023, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $15,390 to be transmitted from BBVA 6908 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 119: On May 31, 2023, an unindicted coconspirator delivered $45,700 in United States currency to the HRL defendants.

Overt Act No. 120: On November 15, 2023, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $19,990 to be transmitted from BBVA 5141 (HRLI) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 121: On January 19, 2024, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of

approximately $19,990 to be transmitted from BBVA 6908 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States.

Overt Act No. 122: On June 18, 2024, defendants OLARTE, LOPEZ, and the HRL defendants caused a wire in the amount of approximately $19,990 to be transmitted from Banco Inbursa (2484) (Infinity) in Mexico to Bank of the West/BMO 3184 (SLA) in the United States.

1                    COUNTS THIRTEEN THROUGH NINETEEN

2              [18 U.S.C. §§ 1956(a)(2)(B)(i), (ii), 2(b)]

3                    [DEFENDANTS OLARTE, LOPEZ, and SLA]

4         79.   The Grand Jury realleges paragraphs 1 through 58 and

5    paragraph 77.

6         80.   On or about the following dates, in Los Angeles County,

7    within the Central District of California, and elsewhere, defendants

8    RALPH OLARTE, HUMBERTO LOPEZ BELMONTE, and SPORT LA, INC., which did

9    business as "H&R Logistics," "HR Logistics," "HRL," and "HRGL," and

10   others known and unknown to the Grand Jury, aiding and abetting each

11   other, knowing that the monetary instruments and funds involved in

12   the financial transactions represented the proceeds of some form of

13   unlawful activity, transported, transmitted, and transferred monetary

14   instruments and funds, namely, the amounts set forth below, from

15   accounts at a financial institution outside the United States, that

16   is, accounts in Mexico, to accounts at financial institutions inside

17   the United States, and caused to be done, knowing that each of the

18   transactions was designed in whole or in part: (i) to conceal and

19   disguise the nature, location, source, ownership and the control of

20   the proceeds of the specified unlawful activity, namely, wire fraud,

21   in violation of Title 18, United States Code, Section 1343, and (ii)

22   to avoid a transaction reporting requirement under federal law,

23   through the following transactions:

| Count | Date | Transaction |
|-------|------|-------------|
| THIRTEEN | 5/21/2020 | An international wire transfer of $10,000 from Banco Inbursa 7567 (Arbol) in Mexico to Wells Fargo 5012 (SLA). |

| Count | Date | Transaction |
|-------|------|-------------|
| FOURTEEN | 8/18/2020 | An international wire transfer of $5,600 from Banco Inbursa 7242 (Arameo) in Mexico to Wells Fargo 5012 (SLA) in the United States. |
| FIFTEEN | 8/20/2020 | An international wire transfer of $9,800 from Banco Inbursa 7242 (Arameo) in Mexico to Wells Fargo 5012 (SLA) in the United States. |
| SIXTEEN | 9/18/2020 | An international wire transfer of $13,973 from Scotiabank 9428 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States. |
| SEVENTEEN | 9/29/2020 | An international wire transfer of $22,670 from Scotiabank 9428 (Suji) in Mexico to Wells Fargo 5012 (SLA) in the United States. |
| EIGHTEEN | 2/24/2022 | An international wire transfer of $19,990 from BBVA 5141 (HRLI) in Mexico to Wells Fargo 5012 (SLA) in the United States. |
| NINETEEN | 2/1/2024 | An international wire transfer of $9,510 from BBVA Bancomer (6908) (Suji) in Mexico to Bank of the West/BMO 3184 (SLA) in the United States. |

1                        COUNTS TWENTY THROUGH TWENTY-TWO

2                            [18 U.S.C. §§ 1001(a)]

3                              [DEFENDANT SLA]

4        81.   The Grand Jury realleges paragraphs 1 through 58 of this

5   Indictment here.

6        82.   On or about the dates set forth below, in Los Angeles

7   County, within the Central District of California, and elsewhere, in

8   a matter within the jurisdiction of the executive branch of the

9   government of the United States, namely, United States Customs and

10  Border Protection ("CBP"), defendant SPORT LA, INC. ("SLA"), which

11  did business as "H&R logistics," "HR Logistics," "HRL," and "HRGL,"

12  knowingly and willfully made, and caused to be made, materially

13  false, fictitious, and fraudulent statements and representations to

14  CBP knowing that such statements and representations to CBP were

15  untrue.

| Count | Date | Statement |
|-------|------|-----------|
| TWENTY | 07/15/2020 | In AES entry – shipment ID 9425962042 defendant SLA falsely claimed the US Principal Exporter Sport LA was exporting "TV" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, as defendant SLA well knew, the true consignee or customer was Unindicted Customer 10. |
| TWENTY-ONE | 06/22/2022 | In AES entry – shipment ID 15982298687 – defendant SLA falsely claimed the US Principal Exporter Sport LA was exporting "BEAUTY PRODUCTS/COSMETICS" to "ultimate consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, as defendant SLA well knew, the true consignee or customer was Unindicted Customer 13. |

| Count | Date | Statement |
|-------|------|-----------|
| TWENTY-TWO | 05/25/2023 | In CBP Form 7512 – reference number 879453455 - defendant SLA falsely claimed in-bond shipment imported by H&R Logistics was transporting "boy jackets" to "consignee" "COMERCIALIZADORA SUJI DE MEXICO" when, in fact, as defendant SLA well knew, the true consignee or customer was Unindicted Customer 5. |

1       FORFEITURE ALLEGATION ONE

2    [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3  83. Pursuant to Rule 32.2 of the Federal Rules of Criminal

4 Procedure, notice is hereby given that the United States of America

5 will seek forfeiture as part of any sentence, pursuant to Title 18,

6 United States Code, Section 981(a)(1)(C) and Title 28, United States

7 Code, Section 2461(c), in the event of any defendant's conviction of

8 the offenses set forth in any of Counts One through Eleven of this

9 Indictment.

10  84. Any defendant so convicted shall forfeit to the United

11 States of America the following:

12    (a) All right, title, and interest in any and all

13 property, real or personal, constituting, or derived from, any

14 proceeds traceable to the offenses; and

15    (b) To the extent such property is not available for

16 forfeiture, a sum of money equal to the total value of the property

17 described in subparagraph (a).

18  85. Pursuant to Title 21, United States Code, Section 853(p),

19 as incorporated by Title 28, United States Code, Section 2461(c), any

20 defendant so convicted shall forfeit substitute property, up to the

21 value of the property described in the preceding paragraph if, as the

22 result of any act or omission of the defendant, the property

23 described in the preceding paragraph or any portion thereof (a)

24 cannot be located upon the exercise of due diligence; (b) has been

25 transferred, sold to, or deposited with a third party; (c) has been

26 placed beyond the jurisdiction of the court; (d) has been

27 substantially diminished in value; or (e) has been commingled with

28 other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

86.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of the offenses set forth in any of Counts Twelve through Nineteen of this Indictment.

87.  Any defendant so convicted shall forfeit to the United States of America the following:

(a)  Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

88.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the

1  course of the money laundering offense unless the defendant, in

2  committing the offense or offenses giving rise to the forfeiture,

3  conducted three or more separate transactions involving a total of

4  $100,000.00 or more in any twelve-month period.

5

6                                           A TRUE BILL

7

8                                           /S/ _____
                                            Foreperson

9  BILAL A. ESSAYLI
   United States Attorney

10

11 *Lindsey Greer Dotson*

12 LINDSEY GREER DOTSON
   Assistant United States Attorney
   Chief, Criminal Division

13

14 J. MARK CHILDS
   Assistant United States Attorney
   Chief, Transnational Organized Crime

15 Section

16 LANA MORTON OWENS
   Assistant United States Attorney

17 Transnational Organized Crime Section

18

19

20

21

22

23

24

25

26

27

28